FILED

2007 Jan-12  AM 09:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

**KPL, infant son**
      **a.k.a. KPM;**

CV-07-P-0075-S

2006 OCT 17  P 4: 47

**represented, at this time,**

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

**Karl Rudolph Lentz, Natural Father,**
**Plaintiff, Pro se**

2:06CV942-MEF

      **vs.**

 **ALABAMA STATE BOARD OF HUMAN RESOURCES, and**
**GOVERNOR BOB RILEY, Chairman, in his official capacity to Execute and**
**individual capacities;**

 **ALABAMA DEPARTMENT OF HUMAN RESOURCES, and**
**PAGE WALLEY,  Acting Director, in his official capacity as Administrator and**
**individual capacities;**

**ALABAMA SUPREME COURT, and CHIEF JUSTICE NABERS , in his  official**
**Judiciary capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**STATE ATTORNEY GENERAL, TROY KING, in his official Judiciary and**
**Prosecuting capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, SANDRA JOHNSON and, in her**
**official and individual capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, JONATHON S. SCHLENKER, in**
**his official and individual capacities;**

**ALABAMA SUPREME COURT, and VERY HONORABLE JUDGE WILLIAM**
**HEREFORD, ST. CLAIRE COUNTY, in his official and individual capacities;**



SCANNED
BAR 10/18/06

ALABAMA  TENTH CIRCUIT COURT a.k.a. JEFFERSON COUNTY
COURTHOUSE, and CHIEF JUDGE VOWELL, in his official and individual
capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE SANDRA STORM, in her
official and individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and CHIEF JUDGE SANDRA STORM, retired, in her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE BRIAN HUFF, in his official and
individual capacities ;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT, and CHIEF JUDGE BRIAN HUFF, in his official and individual
capacities ;

ATTORNEY, BRIAN HUFF, as an associate in the Law Firm of
BOYD, FERNAMBUCQ, VINCENT & DUNN, P.C., in his professional capacity;

ATTORNEY,  BRIAN HUFF, in his individual capacity;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and REFEREE JUDGE ANDRE SPARKS, in his
limited official and individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BAHAKEL  in his/her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BARCLAY, in his/her official and
individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and, DOUGLAS A DELLACCIO JR. in his official and individual
capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and, MARY KAYE LAUMER, in her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY  and, SANDRA EUGENE GREGORY, in her official and
individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY appointed  GUARDIAN AD LITEM  JULIE MARKS, in
her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY GUARDIAN AD LITEM OFFICE and, CELIA LAPIDUS
NADLER, in her official and individual capacities;

JEFFERSON COUNTY DEPARTMENT OF HUMAN RESOURCES, and
TRISH  MUSCOLINO,  Interim Director, JCDHR, in her official and individual
capacity;

ANGELA TANVEER, Assistant Director / Child Welfare, JCDHR, in her official and
individual capacity;

KIM MASHEGO,  Assistant Director / Child Welfare, JCDHR, in her official and
individual capacity;

BARBARA GALLOWAY, Assistant Director / Child Welfare, JCDHR, in her
official and individual capacity;

TENISHA FELTON , original Intake Supervisor, JCDHR, Supervisor, in her
official and individual capacity;

DEIRDRE MARCH, original Intake Caseworker, JCDHR, in her official and
individual capacity;

LISA BROWN, Caseworker, JCDHR, in her official and individual capacity;

ANITA SCOTT-SMITH, a JCDHR, Supervisor, in her official and individual capacity;

KAREN BAZINET, Caseworker, JCDHR, in her official and individual capacity;

TRACIE CURRY, Caseworker, JCDHR, in her official and individual capacity;

TERRY BEASLEY, Caseworker, JCDHR, in her official and individual capacity;

BETH SCHAEFER, - STATE HEADQUARTERS OF ALABAMA DEPARTMENT OF HUMAN RESOURCES - Montgomery, AL. in her official and individual capacity;

DR. GUFFY, attending Pediatric Physician, UAB Hospital in Birmingham, Alabama, in his official capacity;

MARGARET MANGINA, adoptive mother of Mary Kary Mangina, maternal grandmother of KPL.

Sarah Faull, Caseworker, JCDHR, in her official and individual capacity;

BRIEF OF PLAINTIFF
KPL, infant son
and
Karl Rudolph Lentz

RELIEF FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF ALABAMA

KIDNAPING AND FAILURE TO TRAIN

Karl R. Lentz
710 Augusta Farms Rd
Waynesboro,VA 22980
678.665.0593
kldirectv@yahoo.com

## STATEMENT REGARDING ORAL ARGUMENT

The issues presented herein are novel and of tremendous importance. Therefore, the Plaintiff believes that oral argument would be of benefit to the Court.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT...................................................................

TABLE OF CONTENTS...........................................................................................................

TABLE OF AUTHORITIES......................................................................................................

STATUTES

    US CODES..........................................................................................................................
    ALABAMA CODES of 1975..............................................................................................
    ALABAMA ADMINISTRATIVE CODE BOOK...............................................................
    RULES.................................................................................................................................
    CONSTITUTIONAL PROVISIONS...................................................................................
    ALABAMA CONSTITUTION OF 1901.............................................................................
    OTHER AUTHORITIES......................................................................................................

STATEMENT OF JURISDICTION..........................................................................................

    DISTRICT COURT JURISDICTION.................................................................................
    11th CIRCUIT COURT JURISDICTION..........................................................................

U.S. CODES DEFINITIONS.....................................................................................................

COMPLAINT.............................................................................................................................

PARTIES....................................................................................................................................

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW...............................................

STATEMENT OF THE CASE

    A. Background Facts...........................................................................................................
    B. Statement of the Facts....................................................................................................

STANDARD OF REVIEW........................................................................................................

SUMMARY OF THE ARGUMENT.........................................................................................

IMPACT STATEMENT.............................................................................................................

CONCLUSION - REMEDY.......................................................................................................

CERTIFICATE OF SERVICE..................................................................................................

CERTIFICATE OF COMPLIANCE.........................................................................................

## TABLE OF AUTHORITIES

### CASES and JUDGEMENTS

Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, (1961)

Monell v. New York City Department of Social Services , 436 U.S. 658, 98 S ...

City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427 (1985),

City of Canton v. Harris,489 U.S. 378, 109 S. Ct. 1197 (1989).

Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)

Vineyard v. County of Murray, 990 F.2d 1207 (11th Cir.), cert. denied 510 U.S. 1024 (1993)

Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997), cert. denied 118 S.Ct. 852

(1998)

# STATUTES

## U.S. Codes

42 USC 21-1(2) § 1985 (2) (3)
42 USC 21-1 § 1983
42 USC 21-1 (a) § 1988
18 USC 18-1-13 § 242
18 USC 18-1-13 § 241
42 USC 21-1 § 1986

### ALABAMA CODES of 1975

36-25-17(a)
36-25-17(b)

Code 1907, § 4299; Code 1923, § 8050; Code 1940,T.7, §109.
6 -5-102

Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112.
6-5-104 (a)
6-5-104(b)(1)
6-5-104 (b)(2)
6-5-104(b)(3)
6-5-104(b)(4)

Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112, continued
6-5-182
6-5-100/103
6-5-102
36-25-17

### ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION

660-3-11-.03(3)
660-3-11-.03(b)(1)
660-5-34-.02
660-5-34-.03(2)
660-5-34-.04
660-5-34-.04 (4)
660-5-34-.04 (5)(a)
660-5-34-.04(5)(b)
660-5-34-.05(a)

660-5-47-.04(a)
660-5-47-.04(8)
660-5-47-.06
660-5-50-.04
660-5-50-.06(c)
660-5-50-.06(d)
660-5-50-.06(e)
660-5-50-.06(1)
660-5-50-.06(e)
660-5-50-.09

## RULES

Fed.R.Civ.P.2
Fed.R.Civ.P.3
Fed.R.Civ.P.60(b)(3)(6)
Fed.R.Civ.P.39

## CONSTITUTIONAL PROVISIONS

**U.S. Const. Amend.  IV**                    *passim*

**U.S. Const. Amend.  V**                     *passim*

**U.S. Const. Amend.  VI**                    *passim*

**U.S. Const. Amend.  VII**                   *passim*

**U.S. Const. Amend.  VIII**                  *passim*

**U.S. Const. Amend.  X**                     *passim*

## ALABAMA CONSTITUTION OF 1901;

**SECTION 1.  Equality and rights of me.**
**SECTION 2.  People source of power**
**SECTION 5.  Unreasonable search and seizure; search warrants.**
**SECTION 6 .  Rights of persons in criminal prosecutions generally; self-incrimination; due process**
                **of law; right to speedy trial; change of venue.**
**SECTION 10.  Right to prosecute civil cause**
**SECTION 13.  Courts to be open; remedies for all injuries; impartiality of justice**
**SECTION 15.  Excessive fines; cruel or unusual punishment.**
**SECTION 21.  Suspension of laws.**
**SECTION 36.  Constitution of Declaration of Rights.**
**SECTION 75.  Change of venue in civil and criminal cases.**

SECTION 113. Supreme e. .:utive power vested in governor

SECTION 121. Governor may require reports from officers of executive department and officers and managers of state institutions; false reports or failure to file reports constitutes impeachable offense.

SECTION 140. Jurisdiction of supreme court generally; power of supreme court to issue certain remedial and original writs

## OTHER AUTHORITIES

THE ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION.

R.C. CONSENT DECREE OF 1991

ALABAMA CODE OF 1975

ALABAMA CONSTITUTION OF 1901

FEDERAL RULES OF CIVIL PROCEDURE

ALABAMA COURT RULES AND PROCEDURE - STATE-2000

U.S. Constitution of 1788.

## STATEMENT OF JURISDICITON

### A. DISTRICT COURT JURISDICTION

The United States District Court for the Middle District of Alabama has jurisdiction to review this constitutional challenge to the violations of our "Civil Rights" by the Alabama Courts. Through the actions of conspiracy of its acting judicial agents and by the DHR and its executive and administrative agents under Article III, section 2 U.S. Constitution of 1788 and, 42 USC 1983; 28 U.S.C. 1367(a) and authority under 28 USC 2201.

This lawsuit is a constitutional challenge to the State of Alabama's belief in denying us of our civil rights. DHR is justifying their actions relying on the Alabama Code of 1975; TITLE 26-14-7 empowering them the right to intervene to remove (thru due process) by a report of child abuse or neglect . The Agents of DHR, have sworn to never allow us to have our children in our custody while they alive or employed as agents for the state department of human resources, out of sheer hatred, effectively KIDNAPING my / our families children , stripping the children of the birth rights inherently in numerated by The Creator. the custody of our children. Our complain therefore, is based upon the inability to adhere to TITLE 26-14-7.1 (a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k)

allowing us due process, to be heard in a court of law through the premise of basic procedural,

court standards within the United States as well as,42 USC 1983 violations against those

enforcing the challenged statutes against the Movant.

## B  11TH CIRCUIT COURT JURISDICTION

This Court has jurisdiction to hear this lawsuit from

## 28 U.S.C. 85 § 1343.

We are compelled, to pray, to seek a resolution in THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF ALABAMA, for THE DEPARTMENT OF
HUMAN RESOURCES OF ALABAMA , and the JCDHR, division in Birmingham by
violation of our Civil Rights
42 U.S.C. 21 § 1983

We must proceed to ask for relief by proceeding with this lawsuit to be filed THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA,  pursuant to
Fed.R.Civ.P.3 for the action to be commenced we must.

We are seeking relief from a family court order who by detaining our children thru malicious
intrinsic fraud, through violations of our civil rights, misrepresentation of our court-
appointed attorney's and through the misconduct of the JCDHR and its agents.
Furthermore, through violations perpetrated by the JCDHR and its agents knowingly and
with malice violated,  **ALABAMA CODE OF 1975**

### 26-14-7.1 (1)(4)(6)(7)(a)(b)(c)(d)(e)(f)(G)(h)(i)(j)(k)(8)
PLAINTIFF WAS DENIED THE FOLLOWING DUE PROCESS RIGHTS ;
(1). inform alleged of his rights
(4). Ten (10) day notices
(6). To know the time and date of hearings/trials
(7)(a). The right to an attorney
(b). The right to present evidence, oral testimony, and witnesses.
( c). The right to have written knowledge of what is to be said in all hearings/trails
(d). The right to review "alleged" statements - self implication/incrimination
(e). The right to possess all written material prior to hearing/trial
(f). The right to evidence t least 5 days prior to hearing/trial
(g). The right to a written policy codes and rights
(h). The right to cross examine witnesses
(i). The right to subpoena witnesses who are to testify
(j). The right to all written records judge has
(k). The right to an impartial judge.
(8). A judge to compel to attend for "both" sides

United States Code

TITLE 18—CRIMES AND CRIMINAL PROCEDURE;

TITLE 42 – THE PUBLIC HEALTH AND WELFARE ;

TITLE 28--JUDICIARY AND JUDICIAL PROCEDURE ;

# TITLE 18, PART I, CHAPTER 13  § 241 ;

**"Conspiracy against rights ".**

# TITLE 18, PART I, CHAPTER 13  § 242 ;

"Deprivation of rights under color  of law"..

# TITLE 18, PART I, CHAPTER 13  § 247 ;

"Obstruction of persons in the free exercise of religious beliefs".

# TITLE 18, PART I, CHAPTER 13 § 641 ;.

" Public money, property or records"

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

LENTZ____of____

## TITLE 18, PART I, CHAPTER 13 § 666 ;.

Theft or bribery concerning programs receiving Federal funds
(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.
(d) As used in this section—
(1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

(2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

(3) the term "local" means of or pertaining to a political subdivision within a State;

(4) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

(5) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1983 ;

### "Civil action for deprivation of rights"

.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986 ;

Action for neglect to prevent ;

**" Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action**

-

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1985 :

### "Conspiracy to interfere with civil rights".

**(2) Obstructing justice; intimidating party, witness, or juror**

**(3) Depriving persons of rights or privileges.**

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986

**"Proceedings in vindication of civil rights".**

(a) Applicability of statutory and common law

# TITLE 28  PART V  CHAPTER 115- § 1746 ;

**EVIDENCE; DOCUMENTARY**

**(1).Unsworn declarations under penalty of perjury**

**Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a**

deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

# ALABAMA CODES OF 1975

"TITLE 6 – CIVIL PRACTICE
TITLE 13A – CRIMINAL CODE
TITLE 36 – PUBLIC OFFICERS and EMPLOYEES ";

TITLE 6 – CIVIL PRACTICE  CHAPTER 5 - ACTIONS

Article 8 Fraud, Misrepresentation, and Deceit

## TITLE 6 , CHAPTER 5 § 100  - "FRAUD"

### Fraud - Right of action generally.

Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action.

*(Code 1907, §2468; Code 1923, §5676; Code 1940, T. 7, §107.)*

## TITLE 6 , CHAPTER 5 § 101 - " Fraud" -

### Misrepresentations of material facts.

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

*(Code 1907, §4298; Code 1923, §8049; Code 1940, T. 7, §108.)*

## TITLE 6 , CHAPTER 5 § 102 - " Fraud"

### Suppression of material facts.

Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

*(Code 1907, §4299; Code 1923, §8050; Code 1940, T. 7, §109.)*

## TITLE 6 , CHAPTER 5 § 103 - " Fraud"
### Deceit - Right of action generally.

Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.

*(Code 1907, §2469; Code 1923, §5677; Code 1940, T. 7, §110.)*

## TITLE 6 , CHAPTER 5 § 104 - " Fraud"
## Deceit - Fraudulent deceit ;

(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b) A deceit within the meaning of this section is either:

(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;

(2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing it.

*(Code 1923, §§7353, 7354; Code 1940, T. 7, §§111, 112.)*

## TITLE 6 , CHAPTER 5 § 104 - "Libel or slander"

### Burden of proof.

In an action for libel or slander, the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff.

*(Code 1923, §7357; Code 1940, T. 7, §910.)*

TITLE 13A - CRIMINAL CODE,
CHAPTER 2 – PRINCIPLES OF CRIMINAL LIABILITY
ARTICLE 1 CULPABILITY

## TITLE 13A , CHAPTER 5 § 103
## Section  13A-2-1

### Definitions - Generally.

**The following definitions apply to this Criminal Code:**

**(1) ACT. A bodily movement, and such term includes possession of property.**

**(2) VOLUNTARY ACT. An act performed consciously as a result of effort or determination, and such term includes the possession of property if the actor was aware of his physical possession or control thereof for a sufficient time to have been able to terminate it.**

**(3) OMISSION. A failure to perform an act as to which a duty of performance is imposed by law.**

**(4) CONDUCT. An act or omission and its accompanying mental state.**

**(5) TO ACT. Either to perform an act or to omit to perform an act.**

**(6) CULPABLE MENTAL STATE. Such term means "intentionally" or "knowingly" or "recklessly" or with "criminal negligence," as these terms are defined in Section 13A-2-2.**

*(Acts 1977, No. 607, p. 812, §301.)*

## Section 13A-2-2

**1. Definitions - Definitions of culpable mental state.**

**The following definitions apply to this Criminal Code:**

**(1) INTENTIONALLY. A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.**

**(2) KNOWINGLY. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.**

**(3) RECKLESSLY. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof**

TITLE SECTION 36- 25-4 - "State Ethics Commission - Duties; complaint; investigation; rights of respondent concerning hearing; collection of fees; result once violation found".

SECTIONS ; (a) (1) (2) (3) (4) (5) (6) (7) (8) (9) (10)) (11)  (b) (c) (d) (e)    "(e) The commission shall provide discovery to the respondent pursuant to the Alabama Rules of Criminal Procedure as promulgated by the Alabama Supreme Court"

        *(Acts 1973, No. 1056, p. 1699, &sect;18; Acts 1975, No. 130, p. 603, &sect;1; Acts 1979, No. 79-460, p. 814, §1; Acts 1995, No. 95-194, p. 269, &sect;1.)*

# Constitution of Alabama of 1901;

### SECTION 1

1.      **Equality and rights of men.**

That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness

### SECTION 2

1.      **People source of power.**

That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient

### SECTION 5

1.      **Unreasonable search and seizure; search warrants.**

That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation

### SECTION 6

1.      **Rights of persons in criminal prosecutions generally; self-incrimination; due process of law; right to speedy, public trial; change of venue.**

That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by a general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and

he shall not be compelled to give evidence against himself, nor be deprived of

determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement.

## SECTION 10

Right to prosecute civil cause.

That no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party.

## SECTION 13

Courts to be open; remedies for all injuries; impartiality of justice.

That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.

## SECTION 15

Excessive fines; cruel or unusual punishment.

That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted.

## SECTION 2.

Suspension of laws.

That no power of suspending laws shall be exercised except by the legislature.

## SECTION 36

Construction of Declaration of Rights.

That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.

# COMPLAINT

## Injunction and Jurisdiction

1.      This is a complaint for relief under 42 U.S.C. § 1983, with
        the pendant state claims, against certain current and past
        officials, SOCIAL WORKERS of the DEPARTMENT OF
        HUMAN RESOURCES; JUDGES in the ALABAMA
        COURT SYSTEM, and the LAWYERS of THE OFFICE
        OF THE STATE ATTORNEY GENERAL; the
        ADMINISTRATIVE Agencies, EXECUTIVE Agencies, and
        the JUDICIARY BRANCH systems within the borders of
        The State known as ALABAMA, in The United States of
        America, who are regulated by Federal, State and Local
        Administrative Codes, Statutory Codes and Regulations,
        from which they derive their Authority and Control.

(A)     **For Declaratory and Injunctive Relief.**
        That these DEFENDANTS, who in acting on behalf of their
        government sponsored program and in conspiracy with each
        other, Under the Color of Law, through their official and
        individual capacities, within the State of ALABAMA, failed
        to uphold their sworn duty to abide by the legal parameters
        and moral duties encapsulated within the ALABAMA
        ADMINISTRATIVE CODE BOOK, DEPARTMENT OF
        HUMAN RESOURCES, SOCIAL SERVICES DIVISION
        and the spirit of the R.C. CONSENT DECREE of 1991 and
        violated Mr. Lentz' protected due process rights by a pattern
        and practice of criminally editing, falsifying and
        manipulating court reports and depriving him of any
        meaningful remedy.

(B)     **For Damages.**
        Defendants, in conspiracy with each other, deprived Mr.
        Lentz of due process and equal protection of the law in the
        Alabama State Courts for five (5) years, resulting in the
        "kidnaping" of his children, KPL, KSL and KNL. Under
        Color of State Law.

( C )    **For Pendant State Claim.**
        Defendants, by their actions, intentionally interfered with
        Mr. Lentz' parent-child relationship, by their fraudulent and
        deceitful actions in clandestine  Dependency Hearings
        resulting in the kidnaping of his children KPL, KSL and
        KNL..

(2)     Jurisdiction of the pendant state claim is pursuant to 28 USC
        1367, as it is founded on essentially the same factual
        foundation.

(3)     The STATE OF ALABAMA, by virtue of Section 6,
        Subsection 2, of the Constitution of ALABAMA 1901, in
        Article 1 of the Declaration of Rights, has made itself
        accountable for suit in Federal Court, precluding immunity
        under the Eleventh Amendment of the United States
        Constitution.

(4)     That these DEFENDANTS, through their unconstrained
        misuse of the ADMINISTRATIVE, EXECUTIVE,
        JUDICIAL and MEDICAL "positions" they embody,
        directly resulted in malicious fraud, intrinsic fraud,
        embezzlement and kidnaping without due process.

(5)     We pray that this Honorable Court recognizes the
        utmost urgency of this request for an Immediate
        Injunction to prohibit the Jefferson County Department
        of Human Resources and the Jefferson County
        Family Court to continue to deny this Family of our due
        process and civil rights.

(6)     We pray that this Honorable Court will move with the
        utmost diligence and speed and, grant injunctive relief
        and seek an immediate action to impede further
        irreparable damage and estrangement due to the
        fraudulent and deceitful actions of the DEFENDANTS
        and immediately reunite the CHILDREN to their Natural
        Father.

## **PARTIES**

(1)     Governor Bob Riley, as CHAIRMAN for the Department of Human
        Resources knows:

> (a) All STATES accepting federal money under the
> *Americans with Disabilities Act of 1974,* that he is required to
> abide by certain "principles" or "standards" or "codes" and
> "ethics";
>
> (b) By accepting federal money and the rules regulating the
> receipt of such funds, the STATE waivers their 11th
> Amendment right to immunity as a Defendant in a lawsuit(s) as
> a result of their non-compliance to laws, rules, regulations and/
> or guidelines.

(2)     Governor Bob Riley and his Staff in Montgomery have been
        contacted and have had the opportunity to become familiar with the
        procedural transgressions taking place in Jefferson County.

> (a) That through his action and  inaction, and that of his Staff,
> Governor Bob Riley permitted the violations of our due
> process and civil rights in collusion with the Jefferson County
> Department of Human Resources and the Jefferson County
> Family Court.
>
> (b) Through his actions and inaction(s), and that of his Staff,
> he has opened the door to litigation addressing these
> violations in a civil lawsuit (violations of due process and civil
> rights) and possible criminal prosecution or convictions
> (kidnaping, intrinsic fraud and embezzlement).

(3)     The *Americans with Disabilities Act of 1975* clearly stipulates that in
        order
        to qualify as a "Social Service Agency" within the borders of the
        United States, ALABAMA "must" with the utmost discretion, separate
        families.

> (a) The bond between mother/ father to her/his child is an
> Inherent Right: that "these are but the holiest of bonds";

(b) The Department of Human Resources, Social Services Division of ALABAMA should proceed with the utmost discretion and caution
in *considering* the separation of parent/child.

(4)     That, in his official and individual capacities, Governor Bob Riley and his Staff have received numerous written, mailed, e-mailed and oral requests for his intervention in his capacity as the Chairman of the Department of Human Resources .

(5)     The Department of Human Resources in the State of ALABAMA has already
been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

    (a)     The result of this wrongdoing led to the placement of this AGENCY
on federal probation;

    (b)      A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was  to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

(6)     We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

    (a)     That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor
to ensure against fraud and abuse of power.

## PARTIES

(1)     Page Walley, as the acting DIRECTOR for the Department of
        Human Resources knows:

>       (a) All STATES accepting federal money under the
>       *Americans with Disabilities Act of 1974,* that he is required to
>       abide by certain "principles" or "standards" or "codes" and
>       "ethics";
>
>       (b) By accepting federal money and the rules regulating the
>       receipt of such funds, the STATE waivers their 11th
>       Amendment right to immunity as a Defendant in a lawsuit(s) as
>       a result of their non-compliance to laws, rules, regulations and/
>       or guidelines.

(2)     Page Walley, acting Administrative Director of the Department of
        Human Resources and his Staff in the State Office in Montgomery
        have been contacted and have had the opportunity to become
        familiar with the procedural transgressions taking place in Jefferson
        County.

>       (a) That through his action and  inaction, and that of his Staff,
>       Page Walley permitted the violations of our due process and
>       civil rights in collusion with the Jefferson County Department of
>       Human Resources and the Jefferson County Family Court.
>
>       (b) Through his actions and inaction(s), and that of his Staff,
>       he has opened the door to litigation addressing these
>       violations in a civil lawsuit (violations of due process and civil
>       rights) and possible criminal prosecution or convictions
>       (kidnaping, intrinsic fraud and embezzlement).

(3)     The *Americans with Disabilities Act of 1975* clearly stipulates that in
        order to qualify as a "Social Service Agency" within the borders of
        the United States, ALABAMA "must" with the utmost discretion,
        separate families.

>       (a) The bond between mother/ father to her/his child is an
>       Inherent Right: that "these are but the holiest of bonds";

(b) The Department of Human Resources, Social Services Division of ALABAMA should proceed with the utmost discretion and caution in *considering* the separation of parent/child.

(4)    That, in his official and individual capacities, acting DIRECTOR Page Walley and his Staff have received numerous written, mailed, e-mailed and oral requests for his intervention in his capacity as Director .

(5)    The Department of Human Resources in the State of ALABAMA has already been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

      (a)    The result of this wrongdoing led to the placement of this AGENCYon federal probation;

      (b)    A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was  to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

(6)    We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

      (a)    That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor to ensure against fraud and abuse of power.

# PARTIES

(3)   HON. CHIEF JUSTICE NABERS, as Presiding Judge for the ALABAMA
SUPREME COURT, that as a result of improper training and supervision of his
STAFF, permitted the blatant disregard of the due process rights of the Plaintiffs;
by the courts, judges and clerks of courts.

(4)   HON. TROY KING, as the Head of the STATE OF ALABAMA OFFICE OF
THE ATTORNEY GENERAL, that as a result of improper training and
supervision of his STAFF, permitted the blatant disregard of the due process rights
of the Plaintiffs and aggressively prevented the reunification of Plaintiff's Family;

(5)   SANDRA JOHNSON, as the ASSISTANT ATTORNEY GENERAL, stated
during an ISP that "...*as long as I am involved in this case, these children will
NEVER be returned to your families custody...*" The "opinion" and unjustified
"bias" of SANDRA JOHNSON directly resulted in the continuation of the
violations of the RC CONSENT DECREE and the ALABAMA
ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN
RESOURCES, SOCIAL SERVICES DIVISION and the ALABAMA CODE of
1975 against the NATURAL FATHER and offspring;

(6)   JONATHON S SCHLENKER, STATE PROSECUTOR, actively prevented the
commencement of a TPR trial within the 12-18 month time allotment permitted by
LAW, and through intensive back ground checks over a period of FIVE YEARS
was still unable to prosecute the NATURAL FATHER;

(7)   HON. JUDGE HEREFORD, appointed by the SUPREME COURT
should have accused himself when he realized that at a preliminary TPR hearing
the state prosecutor handed over the DHR's court report to the judge;

> (a). After a severe protest by the father stating"We have waited 5 years for
> a "untainted "judge to hear this case , and you sir, have just been tainted by
> the prosecutors by accepting their court report during this preliminary
> hearing, when it clearly states, we the defendants, are allowed access to
> "the court report" five (5) days prior to a hearing/trial, and if our version
> differs with that of the DHR's ,we the defendants are entitled and or
> allowed to submit an "amended version" to the court report" which I, in
> vain, attempted, begged, and pleaded for him to "take" our amendments to
> the court report, as well as those by the DHR and The State Prosecutor.
> I attempted to inform the Judge, (maybe he was not trained to know that he
> is to accept the defendants "story of the events they would like to have
> addressed by the judge/court as well as the state prosecutors

"story/concerns", that although we were not given the court report 5 days prior to hearing, (fortunately or unfortunately, for us, we ASSUMED, what they The DHR, and State prosecutor were going to do/say/state in their version of events, how they were going to "tell" the Judge in their biased opinions how and what they felt must be done in this our trial, watching this transpire in front of the whole courtroom, in front of all the attorneys, family members, and court staff, to me was outrageous , behavior, if they wanted to have only one-side of the story heard , yet again by another judge, why did not the Judge and State prosecutor, just" slip the report into the judges hands when noone was looking, no they ( I was told), that this one-sided event(s) occur all the time for the defendants, defended by the public defenders office are not competent enough in law , that the average defendant is unaware that the practice/acceptance of one-sided evidence in a courtroom, is not only immoral, but illegal as well, we're going to enter into the court report, ( I assume they never witnessed a defendant such as myself , who knew the proper filing to a judge/court procedure), that his, Judge Herefords response was, *" in this courtroom we'll have the say, what I read and what I don't read, who's papers I will accept and whose I will not"* It goes without saying just"whose" paper work he accepted, and those he had not !

(b) This family has been denied their access to a Judge to be heard; DUE PROCESS for five (5) years, where the time limit is set for 12 months, and in extreme TPR cases 18 months

> (1)  When in just the first few days we were informed the Judge requested and was delivered all (5) years worth of CPS  case files, and all case files held by the clerk of courts office, which we the defendants still have not received either the CPS files or 2 of the 3 case files the clerk of court holds to this day after numerous motions granted by judges for their release ,most recently in APRIL 2006 by JUDGE VOWELL, so that we may defend ourselves years (5) years into this and still not be allowed to defend ourselves.

( c ).did not question the conduct or motives of the court-appointed attorney's upon realizing that:

(1) the NATURAL PARENTS reaction when informed they had just won a "great victory", (what victory? We still are not allowed the proper amount of visits to be able to bond) prior to us even entering into the room this was all decided without our attorneys *"OOPS"* my  mistake of forgetting to write on the motion a remedy/relief.) of *a* dismissal of the case.

> (a).*ALL* proceedings that were to take place on 14th of

AUGUST 2006, at 9 am, when we were summoned to appear, all was decided *before* 9am , without out knowledge of ( and it should have been painfully clear to the judge, or at least obviously clear, to the just , that there must be a TREMENDOUS lack of communication going on between ,the public defenders, and their clientele. That, whatever the motion that was submitted by our defense attorneys even  said/requested on our behalf, to allow a discussion of the case to occur prior to the 9AM commencement of the trial, prior to the arrival of the parents/defendants, That a motion for case to be dismissed by 'our' attorneys, without :.

(1) no remedy for relief addressed , which, all we were seeking is the immediate return of OUR children to us, the natural parents ;

(2)upon noticing parents outrage of no remedy being addressed , did not question, the public defense attorneys or admonish them, the public defenders, for their clients reaction to their case being dismissed with no mention of the return remedy for the "motion to dismiss".Should have sent up a signal that something is *terribly not right here today!*

(d). The NATURAL PARENTS had not authorized their attorney's to agree to anything without consulting them first, by their reactions, angst and bewilderment of, was a clear sign that they were unaware of ANY of the proceedings;

(e).Should have been obvious that the NATURAL PARENTS were unaware that MARY KAY LAUMER had not only submitted a MOTION TO DISMISS , the case in its entirety - not just TPR, but failed to gain one, yes, even just one concession,  so at first glance it would conceived as some sort of *"GREAT VICTORY!!"*QUOTED BY OUR DEFENSE ATTORNEY, Ms. Laumeer.

(8)   HON. JUDGE VOWELL, PRESIDING HEAD OF THE ALABAMA TENTH CIRCUIT COURT, in his capacity as overseer of this County's court system, and as SUPERVISOR of the PUBLIC DEFENDERS, for the failure to effectively train and supervise court-appointed attorney's activities;

(9)   JUDGE SANDRA STORM, for threatening then-attorney Brian Huff to withdraw the change of venue of this case or risk being disbarred; and FORBID ANY CONTACT WITH THE NATURAL PARENTS with their infant son, KPL, for TWO YEARS;

(10)   CHIEF JUDGE BRIAN HUFF, for permitting the Court-appointed attorneys

under his supervision to continue to work against the best interest of his/her client(s), for not allowing the  NATURAL FATHER to enter into evidence documentation in his behalf, to allow the continuing suppression of NATURAL FATHER's due process rights;

(11)   BRIAN HUFF, lawyer for NATURAL FATHER, for not aggressively seeking to protect his client's due process rights, for suggesting that the "NATURAL FATHER" just "*walk away and have kids with someone else...*" , for personally and politically benefitting from usurping the due process and civil rights of the NATURAL FATHER;

(12)   REFEREE JUDGE ANDRE SPARKS, upon entering the courtroom remarked without ever meeting and/or speaking with the NATURAL PARENTS that he "....*never met such a cruel, twisted, perverted, sordid person...:*" and proceeded to hand down a judgment without advising the NATURAL PARENTS:
      (A) Why they were there;
      (B) That they were ENTITLED to legal counsel;
      (C)Failed to mention that the day's proceedings would be ex parte;
      (D) DENIED the NATURAL PARENTS the opportunity to SPEAK
         or enter any evidence or testimony on their behalf;
      (E) Made the decision for the NATURAL PARENTS to 'appear'
         "PRO SE"
      (F) Denied the NATURAL PARENTS any access to the records and/or
         transcripts of the Hearing;

(13)   JUDGE BAHAKEL, for rendering decisions WITHOUT
      (A) physically seeing DEFENDANTS;
      (B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;
      (C)Defendant's attorneys being present;
      (D) failed to note that the DEFENDANTS were NEVER present during
         trials/hearings/reviews.
      (E) For allowing Deirdre March, Lisa Brown and Tenisha Felton
        undue influence to the Judge's Chambers and prejudicing his/her
        opinion and causing the due process rights of the NATURAL
        PARENTS to be deemed unworthy of consideration;

(14)   JUDGE BARCLAY, for rendering decisions WITHOUT
      (A) physically seeing DEFENDANTS;
      (B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;
      (C)Defendant's attorneys being present;
      (D) failed to note that the DEFENDANTS were NEVER present during
         trials/hearings/reviews.
      (E) For allowing Deirdre March, Lisa Brown and Tenisha Felton
        undue influence to the Judge's Chambers and prejudicing his/her
        opinion and causing the due process rights of the NATURAL

(A) introducing himself as "OUR" attorney;

(B) by adv_ng us to sign a "VOLUNTARY AG_EMENT" as
a "...*sign of good faith, that you are willing to work with DHR*" ,

(C)That signing the "VOLUNTARY AGREEMENT" would be the
"...*only way to get your son back....*"

(D)That, at "*any time*" we could request custody and legally, DHR
"...*would be required by LAW to return your son...*"

(E) REFUSED to inform of any/all proceedings and its implications,

(F) REFUSED to discuss case with us,

(G)REFUSED to accept phone calls from us,

(H) REFUSED to return ANY calls,

(I) REFUSED to meet with us and prepare us for Hearings/Reviews.

In essence, the behavior of Douglas Dellaccio, Jr. throughout his service to the
NATURAL PARENTS was unprofessional and unethical.

(16)   MARY KAYE LAUMER, failed to act in the best interest of her client by:

(A) failing to advise NATURAL MOTHER of her due process rights,

(B) failing to aggressively DEFEND the NATURAL MOTHER
against the malicious and fraudulent allegations of
Deirdre March, Lisa Brown, Tenisha Felton and other agents
of the JCDHR throughout this ordeal,

(C)for constantly and consistently refusing to file motions in behalf of the
NATURAL MOTHER (ie: release of court reports and any/all
information being used against her),

(D) for constantly and continuously refusing to petition the Court for daily,
routine visits in accordance with the RC CONSENT DECREE and the
ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF
HUMAN RESOURCES, SOCIAL SERVICES DIVISION,

(E) for FAILURE to follow through on requests for INTERROGATORIES,

(F) for FAILURE to present evidence and testimony on behalf on the
NATURAL MOTHER,

(G) for FAILURE to properly advise NATURAL MOTHER of the
DEPENDENCY HEARINGS and their implications.

(H) CONTEMPT OF COURT for REFUSING to relinquish
evidence, documentation, narratives that are being used against the NATURAL
PARENTS;


Although her mortification of Brian Huff's mysterious ascension to his current
position as the Presiding Judge of the Family Court may have dissuaded a lesser
person, Mary Kay Laumer remains a staunch advocate of the JCDHR and its

methodical illicit acquisition of Federal Funds by ignoring the civil and due process rights of her client.

(17)  BETH SCHAEFFER, CELIA NADLER, TRISH MUSCOLINO, ANGELA TANVEER, BARBARA GALLOWAY as Supervisors and/or Directors for failing to:

(A) train their STAFF properly;

(B) to stress the importance of adhering to the guidelines set forth by the RC CONSENT DECREE;

(C) in failing to address concerns brought to their attention by the NATURAL PARENTS, PATERNAL GRANDMOTHER and PATERNAL AUNT, such as:

(1) denial of frequent visits in accordance with the RC CONSENT DECREE;

(2) KPL's failure to thrive;

(3) the environment of the visitation room at the JCDHR building;

(4) repeated requests to access KPL's IEP reports;

(5) KPL arriving at visits without his glasses, leaving him virtually blind;

(6) frequent missed visits of KPL, KSL and KNL;
which is devastating because the NATURAL PARENTS only are permitted one visit per month for two hours, a direct violation of the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK.

(7) denial to have the children baptized in accordance with their Roman Catholic heritage;

(8) FAILURE to address the name changes by the foster care providers; We have provided video documentation to the above mentioned Supervisors/Directors.

(9) CONTEMPT OF COURT for REFUSING to relinquish evidence, documentation, narratives that are being used against the NATURAL PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical procedures and treatments received by KPL, KSL and KNL.

(18)  SANDRA GREGORY, GUARDIAN AD LITEM for not ensuring that, in the best interest of the children, that they develop and maintain strong, healthy bonds with their NATURAL PARENTS and each other as provided by the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK .

We are not trying to "say"or judge what a person does for "recreational enjoyment" with her interactions of fellow mal contents/associates, who may just happen to be, drug dealers, gun runners, or convicted felons, the company she chooses to keep, for her being a free U.S. citizen , is her "right". For whom, or

what, she chooses to do at 9am in the morning, after just dropping her child off to school, and knowing for the rest of the day her child will be taken care of is to be commended, by at least making sure her child is safe, before she decided to delve into an , our opinion a very questionable elicit affair" with known drug dealers, gun runners, or convicted felons who she chooses to be with at 9 am, in the morning, what ever she needs to do in her life, in her pursuit of happiness, should not be impeded, to find fulfilment, we will defend her "rights" to do as she pleases, in a motel room , behind closed doors, as long as those activities have no impact on others,.... this is where we have this moral, ethical, legal, DILEMMA,

(a). As our children's court appointed attorney, was she ever under the influence of narcotics of a criminal nature, that by the use of these "drugs" was her ability to render justice influenced or affected? Was she able to "think" clearly? Was, when she was at meetings, hearings, and trials representing the best interests of our children, as well as other families children was she really "all" there, in her mental capacity to be "all" there, do delegate her official duties to these children she represented?

It is now laughable, (but at the time was quite, tragic and traumatic, for all concerned for her well being and safety, her friends ,families, coworkers and the concerned public as well ),for the ability for the local police, state police, and federal FBI, and the implementation of the "Amber Alert" system to work so well. and, for the media CNN, in particular to get the word out, for all involved in the search for Ms. Gregory, to pull together their resources, so quickly and effectively is impressive for this was not just a "local"event but a National, even an International news story as well. We are suggesting that after recent these events that unfolded, that for the Jefferson County Family Court, to think about looking a little more throughly, into Ms. Gregory's, extremely questionable, "lifestyle" activities she enjoys to partake in either after work, or before work . This "lifestyle", (for this is the woman everyone "thought" was kidnaped and being taken/forced into a hotel room against her will, while it was an actual consensual "endeavor"). For us the defendants to have to live up to her "standards" of "proper" conduct" is laughable, just how many other Sandra Eugene Gregory "types" does DHR employ? Just what is their screening process, and who often do their employees mandate to take drug tests , to ensure "proper" state of mind, can at the very least, to be maintained. For this woman never had told the court or in our personal contestations or in meetings discussing  the issue of placement, and reunification  with family for our children, she NEVER  had one decent opinion of her view of the father , that when looking his way, to outwardly show utter disgust , for even having to be in the same space, room, building, or planet such a vile animal, that some how someone was "allowing" me the right to breath air, that she felt she was entitled too, she effectively  attempted in every mannerisms imaginable, to persuade the Judge, other DHR workers, other attorneys , defense attorneys as well as state attorney generals, for she was the LAW that represented

our children, to elicit her disdain to the court on DHR 's behalf, but now after this
"motel mid-day rendevous", it is now apparent to us, her total disorientation
during our encounters with, Ms. Gregory her "look" of misorientation, this needs
to be seriously addressed and all her other cases as well where it was her job to tell
the court the TRUTH, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Who knows how
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *many other Cases*
*have been affected by her "Self-Induced", Drug-Afflicted*
*LifeStyle"?*

(19) KIM MASHEGO , ANITA SCOTT-SMITH , KAREN BAZINET and TERRY
BEASLEY for :

> (1) denial of frequent visits in accordance with the RC CONSENT
> DECREE;
> (2) KPL's failure to thrive;
> (3) the environment of the visitation room at the JCDHR building;
> (4) repeated requests to access KPL's IEP reports;
> (5) KPL arriving at visits without his glasses, leaving him virtually blind;
> (6) frequent missed visits of KPL, KSL and KNL;
>> which is devastating because the NATURAL PARENTS only
>> are permitted one visit per month for two hours, a direct violation
>> of the RC CONSENT DECREE of 1991 and the ALABAMA
>> ADMINISTRATIVE CODE BOOK.
> (7) denial to have the children baptized in accordance with their
> Roman Catholic heritage;
> (8) FAILURE to address the name changes by the foster care providers;
> We have provided video documentation to the above mentioned
> Supervisors/Directors.
> (9) CONTEMPT OF COURT for REFUSING to relinquish
> evidence, documentation, narratives that are being used against
> the NATURAL PARENTS;
> (10) Refusing to inform the NATURAL PARENTS of medical procedures
> and treatments received by KPL, KSL and KNL.

(20) DEIRDRE MARCH, TENISHA FELTON, and TRACIE CURRY for their:
(A) racist attitudes towards the NATURAL FATHER who happens to be an older,
white/caucasian man, their judgements on a man they never spoke to or met, to
consorting with each other, thereby causing him depravation of his civil brights, yes
quite ironic !

(B) Based upon their training, relied upon "PROFILING" techniques
and *assumed* that based solely on his appearance, that the
NATURAL FATHER "...*must be a violent, abusive man that drinks, smokes and
does drugs cause he has longhair, looks like a biker and does not act like us*

*because he is a yankee..."*

(C)DENIED the NATURAL PARENTS of any contact with KPL for two
 years because just *"...hearing his name, made my skin crawl..."*
*[Deirdre March]*

(D) manipulated information gathered at ISP's to create documents that
made it "appear" that the NATURAL PARENTS were in agreeance with all
procedures and recommendations;

(E) had undue influence over the Court's ear and effectively prejudiced
 the Court against the NATURAL PARENTS sight unseen;

(F) continue to disseminate false information regarding the NATURAL
 FATHER's "alleged" abusive behavior which was discredited in a
 Deposition in May 2003;

(G) continually FAIL to mention to the COURT, that it is ILLEGAL
to prohibit visitation between parents and their children;

(H) FAIL to address concerns the NATURAL PARENTS, the PATERNAL
 GRANDMOTHER , and the PATERNAL AUNT regarding:
    (1) denial of frequent visits in accordance with the RC CONSENT DECREE;

    (2) KPL's failure to thrive;

    (3) the environment of the visitation room at the JCDHR building;

    (4) denied repeated requests to access KPL's IEP reports;

    (5) KPL arriving at visits without his glasses, leaving him virtually blind;

    (6) frequent missed visits of KPL, KSL and KNL;
    which is devastating because the NATURAL PARENTS only          are
    permitted one visit per month for two hours, a direct violation
     of the RC CONSENT DECREE of 1991 and the ALABAMA
    ADMINISTRATIVE CODE BOOK.

    (7) denial to have the children baptized in accordance with their
     Roman Catholic heritage;
    (8) FAILURE to address the name changes by the foster care providers;
            We have provided video documentation to the above mentioned
            Supervisors/Directors.
    (9) CONTEMPT OF COURT for REFUSING to relinquish

evidence, documentation, narratives that are being used against the
NATURAL PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical procedures
and treatments received by KPL, KSL and KNL.

(21) LISA BROWN, for becoming personally involved with OUR children and
deliberately manipulating and falsifying court reports, and:

(1) denial of frequent visits in accordance with the RC CONSENT DECREE;
(2) CONTEMPT OF COURT for PURPOSELY delaying the paternity test
that was ordered in DEC 2001 and managed to MANIPULATE the system
and blatantly disregard the DUE PROCESS rights not only of the Natural
Father, but that of KPL, who *has a family that is willing, able and ready* to
welcome him into the FAMILY; (**JCDHR *FINALLY* produced KPL in**
~~NOVEMBER 2003~~) *May, 2004. For six months after birth we were*
(3)KPL's failure to thrive; *allowed minimal visitation and we*
*were denied any contact with KPL*
(3) the environment of the visitation room at the JCDHR building; *from May 2003*
*until May 2004.*
(4) denied repeated requests to access KPL's IEP reports;
(5) KPL arriving at visits without his glasses, leaving him virtually blind;
(6) frequent missed visits of KPL, KSL and KNL;
which is devastating because the NATURAL PARENTS only
are permitted one visit per month for two hours, a direct violation
of the RC CONSENT DECREE of 1991 and the ALABAMA
ADMINISTRATIVE CODE BOOK.
(7) denial to have the children baptized in accordance with their
Roman Catholic heritage;
(8) FAILURE to address the name changes by the foster care providers;
We have provided video documentation to the above mentioned
Supervisors/Directors.
(9) CONTEMPT OF COURT for REFUSING to relinquish
evidence, documentation, narratives that are being used against
the NATURAL PARENTS;
(10) Refusing to inform the NATURAL PARENTS of medical procedures
and treatments received by KPL, KSL and KNL.

(22) DR GUFFY, for giving false testimony which directly resulted in the loss of custody
of KPL.

(23)  MARGARET MANGINA, for:

        (A) conspiring with MARY KAY MANGINA to
        abscond with KPL with the sole purpose for acquiring a sibling for BM,
        MARY KAY MANGINA's four-year old daughter, and a healthy child
        support check;
        (B) for persuading MARY KAY MANGINA to file false police reports;
        (C)for attempting to file false police reports with the City of Homewood.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)   Whether the Jefferson County Family Court erred by prohibiting the Plaintiff's
due process rights under 26-14-7.1?

(2)   Through the manipulation and falsifying of court reports, did the STATE of
ALABAMA illegally receive Federal funding?

(3)   Whether the DHR abused its discretion when it prevented the Natural Parents
from baptizing their children according to their Roman Catholic beliefs, and
stated that the children were "...*in good Baptist homes and* [a Roman Catholic]
*baptism wouldn't be necessary"* ?

(4)   Whether the legal counsel and/or court-appointed attorney's provided by the
Jefferson County Family Court system adhered to a code of standard and ethics to
reasonably defend his/her client(s)?

(5)   Whether the Social Workers representing the JCDHR repeatedly perjured
themselves by intentionally omitting evidence and/or documentation throughout
the past five years on behalf of the Natural Parents ?

(6)   Whether the JCDHR and the Family Court in Jefferson County erred and
blatantly abused their authority and power by having HEARINGS/REVIEWS
in clandestine meetings and INTENTIONALLY, KNOWINGLY and
WILLINGLY informed the Natural Parents that HEARINGS/REVIEWS
were rescheduled, when in fact, court was in session?

## BACKGROUND FACTS

Mary Kay Mangina , natural mother, and her adoptive mother, Margaret Mangina, in July 2001, went to consult with Mike Kendall, Attorney, in Birmingham, Alabama, in a fact-finding mission to determine how to prevent Karl Lentz from legally obtaining custody rights to their unborn child.

At the time Mary Kay Mangina met Karl Lentz on 7 July 2000, she was unemployed and had been since December 1998.(Exhibit 1)

Margaret Mangina, 75 years old, was employed at a Tuxedo Rental Shop as a Clerk.

Mary Kay Mangina and her daughter, Brittany Anderson, 4 years old, lived with her adoptive mother, Margaret Mangina, and her adopted brother, Charlie Mangina, 38 and unemployed; and Patrick Mangina,40 and unemployed at 3123-C Lancaster Court, Homewood, Alabama 35209 – a tiny, two(2) bedroom apartment.

Mary Kay Mangina had been involved in incidences of domestic violence with Scott Anderson, the natural father of Brittany Anderson and, her brother, Charlie Mangina.(exhibit 2; exhibit 3)

Unbeknownst to Karl Lentz, Mary Kay Mangina had a history of public drinking, DUI's and domestic violence, which were alcohol-related incidences from 1992-1999.(exhibit 4)

Karl Lentz at this time was employed by Direct TV Satellite Company and earning/grossing approximately one thousand dollars ($1,000.00) per week as an independent contractor.

It was the intention of Mary Kay Mangina to become pregnant with Karl's child, file false claims of abuse against him and "run him out of town" and then receive child support of at least one thousand dollars ($1,000.00) per month as estimated by her lawyer, Mike Kendall.

This child support would enable Mary Kay Mangina and Margaret Mangina to live comfortably for eighteen (18) years; provide a much desired sibling for Brittany; and no interference from Karl Lentz because she did, in fact, eventually have an Order of Protection placed against him.
(Exhibit 5)

These allegations, which prompted and enforced an ORDER OF PROTECTION, and have been used against Karl Lentz to prevent him from gaining custody of his children, were proved unfounded and fabricated in a Deposition 5 May 2003. (Exhibit 6)

Karl Lentz , age 38, has not, nor has ever been, convicted of a crime of neglect and/or abuse of a child.

Deirdre March, Lisa Brown, all caseworkers and supervisors involved with this case in the JCDHR system, has erroneously referred to Karl Lentz, the natural father, as Kole Lentz, the son. An attempt to correct this gross oversight was made 12 March 2002 in the open court of Judge Sparks. This is just one, small example to demonstrate the arrogance of the JCDHR and the Judge's of the Family Court system.

Karl Lentz approached Judge Sparks and told him his name was not "Kole" - that "Kole was his son".

Patricia Russo, natural mother of Karl Lentz, and present in court 12 March 2002, commented in open court to Judge Sparks, that in fact, his given name is "Karl" not "Kole".

Judge Sparks admonished Patricia Russo in open court and stated that "if she opened her mouth again - she would go to jail..."

Karl Lentz attempted to explain, again, the predicament to Judge Sparks. That no one, since 14 August 2001, had bothered to ask his name, ask for proof of identity - that the JCDHR workers presumed his name was Kole.

Judge Spark's response was "What are you trying to pull here?" Karl's response was to "...correct the record."

This condescending attitude towards the Defendant(s) named in JU-2001-51832.01 , the natural parent(s) in this case, in Court and at ISP's, has made it impossible to communicate with the Family Court and the Department of Human Resources, Social Services Division in Jefferson County.

---

STATEMENT of The FACTS

1.  Mary Kay Mangina went to Dr Gary Swicord, her dentist in Birmingham, for a routine root canal on 1 August 2001 at 8am. (Exhibit 7)

2.  Mary Kay Mangina went to her obstetrician at the High Risk Clinic, for a regularly scheduled appointment at 12pm.

3.  The nurses at the High-Risk Clinic noticed the unborn baby's heartbeat was irregular.

4.  Mary Kay Mangina was admitted into UAB for a stress test on 1 August 2001.

5.  Kole Patrick Mangina was born on 2 August 2001 at approximately 4am.

6.  No comment was made on the black-and-blue and swollen appearance of Mary Kay's face as a result of the previous days' root canal.

7.  Margaret Mangina ( Mary's adoptive mother), came to UAB to visit with Mary Kay Mangina (adopted daughter) to visit her new grandson.

8.  Margaret Mangina, (Mary Kay Mangina's adoptive mother) who was seeking a sibling for Brittany Anderson (Mary Mangina's daughter from a previous marriage), sought the aid of social worker, Calee Bradley to fabricate a false report of the "brutal beating" that Mary Kay Mangina sustained at the hands Karl Lentz on 1 August 2001 which allegedly  precipitated her premature labor.

9.  Calee Bradley, Deirdre March,  Lisa Brown proceeded to flagrantly misuse their authority as agents of the State of Alabama, in the capacity of social workers for the Department of Human Resources, by 'presuming' Karl was guilty *without* an investigation. (*Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.04)

10.  Margaret Mangina told social workers, Calee Bradley, Deirdre March, Lisa Brown and Dupree Williams  that Mary's face was swollen and black-and-blue because Karl Lentz  beat  her so bad,  he knocked a *molar* out of her head and allegedly causing Mary to go into premature labor.

11.  Both Karl Lentz and Mary Kay Mangina refuted this allegation.

12.  Mary Kay Mangina  had gone to her dentist, Dr. Grady Swicord, Birmingham, Alabama,  the day before ( 1 AUGUST 2001) to have a root canal performed.

13.   Mary Kay Mangina was able to produce documentation of this dental work. (Exhibit 7)

14.   Karl Lentz and Mary Kay Mangina demanded that either a doctor  was called in to count Mary Kay's teeth, or that an x-ray be done. Appendix 1

15.    Lisa Brown adamantly refused, stating that *"...it would traumatize the victim..."* Oddly enough, Ms Brown NEGLECTED to report, in her capacity as a mandated reporter, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.03(2) , this brutal beating of a woman 7 ½ months pregnant to the authorities  *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.05(a) . One must ask, *WHY?*

16.   Deirdre March and Lisa Brown *knew* the alleged assault *never happened.* 13A-2-1(6)

17.    Deirdre March and Lisa Brown *chose* to falsify documents and report false information to her supervisors and the Court.   13A-2-1(6); 6-5-104

18.   This false and malicious information is what the DHR , the lawyers, the Guardian ad Litems and the Judges have based this illegal kidnaping of Kole Patrick Mangina, Kolette Shay Lentz and Kameryn Nicole Lentz. 42USC 21-1 §1983

19.    Had Deirdre March, Lisa Brown and the Supervisors performed their jobs properly, without prejudice, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.04 (4)(5) (a)(b), and actually questioned the dentist,   Kole Patrick Mangina would have come home.

20.   Margaret Mangina, Deirdre March and Lisa Brown and their Supervisors had *presumed* based on Karl Lentz' "appearance", that of a single, older white male, a traveling independent contractor,   that he *must* have had a criminal record and that this *kidnaping* would be a slam-dunk.

21.   Lisa Brown and her colleagues *presumed* that Karl and his extended family would not accept Kole *because* he is a child with Down Syndrome; the Mangina Family did not want a "damaged" child; the Lentz-Russo-Garner Family begged to have him returned to their custody.

22.  Lisa Brown  went so far as to report that Karl  "had a strong negative reaction" to Kole. Not true. The Mangina Family - Margaret and Charlie, had a strong negative reaction. Once Kole was diagnosed with Down Syndrome, Margaret and Charlie never visited with Kole again.(exhibit 7)

23.  Dr Guffee, escorted Mary Kay and Karl Lentz to the ICU where KPL was being cared for.

24.  Also, in the ICU were the Staff Nurses and four (4) unknown social workers.

25.  Dr Guffee told us that Kole Patrick may have Down Syndrome - and told us that "Kole was going to be blind, deaf, crippled and severely retarded..."

26.  This news was shocking.

27.  One tear came down Mary's face.  That was the extent of our "strong, negative reaction."

28.  Mary Kay Mangina understood the importance of breast milk and the unequivocal benefits for KPL, and immediately rented a breast pump from the Alabama Department of Public Health on 6 August 2001. (Exhibit 8)

29.  Lisa Brown reported on 24 August 2001 that a "Dr. Demmitt ...refused to send child home with parents."  Lisa Brown does not give supporting testimony why and how he came to this determination.  We never met him.

30.  Margaret Mangina went home and returned all the items she purchased for Kole and then changed the locks on the apartment at 3123-C Lancaster Court,  so Mary Kay could not return with KPL once they were discharged.


31.   DHR removed KPL to an undisclosed place within UAB Hospital and denied Karl and Mary Kay all opportunity to bond with their infant son. VIOLATION RC CONSENT DECREE #45(a);#58; #59 and  Alabama Administrative Code Book 660-5-50-.04

32.  Immediately following the removal of Kole from his parents, Karl Lentz, father, has :
      (a) tried to ascertain the reason(s) why Kole Patrick was removed from his custody;
        (b) the code that the JCDHR was relying on to prohibit *any*

visitation of father/son for two (2) years.
Violation of RC Consent Decree 45(a); 58 and
Alabama Administrative Code Book 660-5-50-.04 and
660-5-50-.06(c)

33.  On 14 August 2001, JCDHR case worker, Deirdre March, filed a
Dependent Petition citing Karl Lentz as the natural father.

34.  On 14 August 2001, Deirdre March falsely stated that she was not aware
"...of any person who is not a party to these proceedings who has physical
custody or claims to have custody or visitation rights with respect to this
child." (Exhibit 9)    6-5-104(3)(b)

35.  DHR was bombarded with phone calls (documented) from Karl Lentz, the
father, Patricia Russo, the paternal grandmother and Karen Garner, the
paternal aunt - all requesting that Kole be temporarily placed with his
family.

36.  Three days later, on 17 August 2001, Deirdre March recanted Karl's
parental status and, now refers to him as the "putative father" (Exhibit 9)

37.  The "parties" were not notified of their right to counsel; Karl and Mary Kay
were not told there were "charges" and/or "allegations", nor were they ever
in possession of any documentation until *AUGUST 2006.*
(____USC CODE_____;
RC CONSENT DECREE #59

38.  The delay in placement of KPL with his father, Karl Lentz, occurred
because DHR and the Court REFUSED to recognize him as the biological
father . 13A-2-2(4)

39.  Karl Lentz and Mary Mangina signed an affidavit of paternity both agreeing
that Karl Lentz was , in fact, the biological father. It was signed and
notarized in accordance with the *Alabama Department of Human
Resources Social Services Division, Administrative Code Book,* 660-3-11-
.03(3).

40.  This document was included in the case file, however, Deirdre March and
Lisa Brown still refused to acknowledge Karl Lentz as the biological father.
6-5-104(3)(b)

41.  Karl Lentz and Mary Mangina requested that a paternity test was done at

UAB.  Although Lisa Brown and Deirdre March had the authority to order one, they denied this request  *Alabama Department of Human Resources, Social Services Division, Administrative Code Book* , 660-3-11-.03(b)(1).

42.    DHR denied , nor would entertain any placement of KPL with his paternal family stating that *"... it would be illegal to spend County and Federal money until a DNA test came back positive..."* and validated that DHR was indeed *"...working with the right family"*.

43.    Karl Lentz vigorously approached the Court and DHR and demanded a DNA test with no success for EIGHTEEN (18) MONTHS.  The Court and DHR had ample opportunity to order a DNA test.  The Family Court in Jefferson County has a testing facility on-site and offers free testing to determine paternity. 42 USC 21-1 1983

44.    As a resident of Alabama and a child in custody, Kole Patrick Mangina  had the right to a paternity test according to the *Alabama Department of Human Resources, Social Services Division, Administrative Code Book*  660-3-11-.02

45.    On 6 September 2001, Deirdre March recommended that Karl Lentz and Mary Kay Mangina attend parenting classes. 6-5-104(b)(4)

46.    Karl Lentz and Mary Kay Mangina left the "Intake meeting" and immediately signed up for Parenting classes at the Exchange Club.

47.    The parenting class program consists of 15 meetings spanning a fifteen (15) week period.

48.    Karl Lentz and Mary Kay Mangina completed the parenting classes on 26 September 2001 - *twenty-one (21) days later* - three(3) weeks,  not the average fifteen (15) weeks. - to prove their sincere desire to be reunited with KPL as fast as time would allow. Exhibit 10

49.    Karl Lentz and Mary Kay Mangina provided documentation of the completion of the program to Deirdre March and Lisa Brown and it became part of the case file. EXHIBIT 10

50.    However, although all "parties" agreed that KPL would be returned to his natural parents upon completion of the parenting program of the Exchange Club, Deirdre March and Lisa Brown "changed" their minds  - without

explanation, without cause, violated a lawful, binding contract between us. 6-5-104(b)(3)(4)

51.  On 9 November 2001, in an ISP submitted by Lisa Brown:

(A) Lisa Brown reports that Karl had completed parenting classes.

> Karl was not court-ordered to do so, but attended to support Mary Kay.

(B) "...Kole Lentz needs to learn how to parent and meet the needs of his children..."

> Karl Lentz at this time, is 40 years old, has raised two (2) step-children and has five (5) grandchildren without incident.

(C) Lisa Brown states that Karl and Mary "tried unsuccessfully to take Brittany away from her school and grandmother.

(1) Karl was not involved;

(2) Mary Kay still had legal custody of Brittany.

(D) JCDHR was in contempt of court for refusing to comply with their own recommendations:

(1) actively and aggressively prohibited any contact with Kole for two years;

> DIRECT VIOLATION OF RC CONSENT DECREE # 45(a) and 58;  ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2); 660-5-50-.06; 660-5-50-.06(1)(e)

(2) that the parents be involved with all doctor visits; ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06 (c)

(3) that JCDHR will make a case aide to set-up bi-weekly visits to begin on 14 November 2001, and failed to follow through. ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(c); 660-5-50-.06(e); RC CONSENT DECREE #45 (a), #58

(E) Lisa Brown claims Kole's reason for entry into care was "Father's history of domestic violence." There were allegations, but no investigation, no evidence - no convictions.

(F) Mary Kay chose not to return to Margaret Mangina's apartment because:

(1) Margaret and Charlie's strong negative reaction to KPL and that he was "damaged";

(2) Charlie Mangina was abusive and dangerous to Mary Kay (Exhibit 11)

(3) Mary Kay refused to return to an abusive household.

(G) Although Karl's mother, Patricia Russo, and his sister, Karen Garner, were able and willing to take care of Kole and in constant contact with Lisa

Brown and Deirdre March, in an attempt to prevent placement in Foster Care, they  fail to mention in this ISP that there are placement options. 6-5-101; 6-5-102;6-5-103;6-5-104(b)(1)(2)(3)

(H) Karl and Mary Kay did attend Kole's first doctor visit with Lisa Brown.
    (1) Lisa Brown attempted to convince the Pediatrician to "enhance" KPL's disabilities in order to receive additional federal funding.
        18USC Part I,Chap13 § 666
    (2) The Pediatrician refused.
    (3) Lisa Brown told her not to worry about it, that "...there were other ways to get more money..."

(I) Karl and Mary Kay immediately *went* to Montgomery, to the State Headquarters of the Department of Social Services, and informed Beth Schaeffer about Lisa Brown's attempted coercion of the intern to falsify medical documents and of the improprieties that took place during that visit.

(J) As a  result of the conversation with Beth Schaeffer and the ensuing investigation into these allegations against Lisa Brown, Karl and Mary Kay were forbidden any contact with Kole for two (2) years
    DIRECT VIOLATIONS RC CONSENT DECREE 45(a); 58;59 and the ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2);660-5-50-.06(c); 660-5-50-.06(1)(e)


(K)    Karl Lentz and his Family requested that we have the opportunity to baptize KPL as is our tradition and according to our Roman Catholic beliefs.
        (i) Deirdre March and Lisa Brown stated that KPL *"...is in a Baptist household and his religious needs are being met..."*
        DIRECT VIOLATION: RC CONSENT DECREE #46

51.    Karl Lentz was summoned to court on 15 November 2001.

52.    Karl Lentz wanted to hire his own legal counsel, but couldn't because JCDHR and its agents refused to inform Karl of the "allegations" made against him, or divulge the purpose of the court appearance. 42 USC 21-I § 1986;42 USC 21-I §1983; 42 USC 21-I §1985

53.    Therefore, the court appointed Douglas Dellaccio, Jr to represent him.

54.  Douglas Dellaccio, Jr.
              :failed to disclose allegations made against Karl Lentz;
              : did not review the case with Karl Lentz prior to the hearing;
              : failed to provide Karl Lentz with competent legal counsel;
              : failed to discuss a plan of action.

55.  Karl Lentz was ordered to appear on 21 November 2001 at the Jefferson
     County Family Court.

56.  Karl Lentz and Mary Kay Mangina arrived at the Jefferson County Family
     Court at 8:30 - a half an hour prior to his/her scheduled appearance.

57.  The Security Guard in the Lobby told Karl that the Courthouse was closed;
     that it was the day before Thanksgiving and that no hearings were being
     held that day.

58.  Karl Lentz showed the Security Guard the Order to Appear, and the
     Security Guard gave him access to the building.

59.  As disclosed by the Security Guard, the Jefferson County Family Court was
     vacant.

60.  Karl Lentz and Mary Kay immediately went to Montgomery to complain.

61.  Karl Lentz and Mary Kay spoke with Beth Schaeffer, in the DHR State
     Headquarters in Montgomery and vehemently voiced their concerns and
     transgressions (reporting of false allegations by case workers, reclassifying
     paternity status, refusal to place with family members, using incorrect
     names and addresses, no documentation, no access to ISP and Court
     Hearings, etc....) at the hands of the case workers in Jefferson County.

62.  Interestingly, and oddly enough, a Court Report was generated on 21
     November 2001 - without our presence, without counsel, without a Judge.
     (Exhibit 12)

63.  The Clerk of Court, Jefferson County and the JCDHR deliberately and
     improperly addressed  summons to appear in court in a concerted effort to
     "prove" that Karl Lentz and Mary Kay were not only irresponsible, but
     disinterested in regaining custody.
      (Exhibit 13 - 9 Nov 2001)

64. On 3 December 2001,  Judge Sandra Storm ordered a paternity test, to be paid for by JCDHR, for Karl Lentz.

65. Karl Lentz never denied paternity of KPL and welcomed the opportunity to prove to Deirdre March and Lisa Brown that he was indeed, KPL's natural father, which they still adamantly refused to believe and/or accept.

66. It was divulged in the 5 December 2001 evaluation of Mary Kay Mangina by theAltamont Counseling Associates, P.C, 300 Vestavia Parkway, Suite 2300, Birmingham, Alabama 35216-3788, - specifically Patrick Dunne, MA, LPC that Deirdre March told him that

> *"Her social worker[Deirdre March] reported the boyfriend [Karl Lentz] had used such discipline as putting the children outside all day without supervision"to make a man out of him."*
> Exhibit 14

67. Karl Lentz NEVER HAD physical custody of his son, KPL.

68. The last male child born to the Lentz-Russo-Garner family was born in December 1983, nineteen (19) years ago.

69. Karl Lentz never had a male child in his care.

70. This statement was *completely,* intentionally, knowingly and maliciously fabricated by Deirdre March.42 USC 21-I § 1985(2)

71. Deirdre March and Lisa Brown further slandered Karl Lentz by stating that he referred to his son was a "freak on a leash". Exhibit 14, page 2

72. However, when Patrick Dunne, evaluator, asked Mary Kay if Karl Lentz had an "issue" with KPL being diagnosed with  Down Syndrome, Mary Kay replied,

> *"It doesn't bother him to have a child with Down's syndrome."* Exhibit 14, page 2

73. On 8 December 2001, Mary Kay filed, through the prodding of Lisa Brown, JCDHR and her mother, Margaret Mangina to conspire and create charges with the expressed goal of reunification with her children BA and KPL,. a false police report claiming she was a victim of domestic assault.
    (A) In doing so, it would demonstrate that Mary Kay was willing to "work" with
    the Jefferson County DHR to achieve their "final solution";
    (B) Criminal charges were filed against Karl Lentz ; he was subsequently arrested and released on bail. Exhibit 15

(C)   Karl Lentz, through his attorney, Brian Huff, demanded a deposition, forced Mary Kay, under oath, to testify that her claim was fraudulent
Exhibit 16 5/5/03 Deposition

(D)   Mary Kay attempted to stick to her original story, but under cross-examination, the massive inconsistencies within her testimony of the actual events that happened that day proved that the charges were unfounded.

# 2002

74.   Lisa Brown and Kim Mashego submitted a court report for Judicial Review to Judge
Bahakel on 12 March 2002.

75.   Lisa Brown reports that Mary Kay

*"...reported to a caseworker that she had Mr Lentz arrested two times after a particularly brutal beating, once with the Birmingham Police Department and once with the Homewood Police Department within 24- hour period."*
**and**
*"...Ms Mangina failed to attend and press charges on Mr Lentz...."* Exhibit 15

(a) Lisa Brown fails to mention that Mary Kay *had admitted* to falsifying aforementioned police reports.

(b) Mary Kay did show up for one of these court dates in
_____and was admonished by Judge_____for filing a false police report.

(c)At this time, Judge_____ told Mary Kay that the next time she attempted to appear in Court to swear to false testimony, that she would be doing jail time.

(d) Ergo, Mary Kay *"failed to attend and press charges on Mr Lentz..."*

76.   Lisa Brown manages to slander and libel Patricia Russo, paternal grandmother in the 12 March 2002 court report.

(a) Lisa Brown accuses Patricia Russo of *"...abusing drugs and alcohol."*
Exhibit 15

(b) Patricia Russo has no history of drug and/or alcohol abuse.

77.  Lisa Brown claims that Patricia Russo *"does not return calls".*
> (a) Upon learning that KPL was taken into custody, Patricia Russo, paternal grandmother, aggressively and actively maintained phone contact with Lisa Brown, Tenesha Felton and other supervisors in the JCDHR. EXHIBIT 15, page 2

78.  Lisa Brown states that
> *" Ms Russo stated that they were not sure at this time if they would be able to care for KPL."* EXHIBIT 15, page 2
>
> (a) At no time, did Patricia Russo not offer/demand/plead for KPL's release to her custody.
>
> (b)Patricia Russo had already researched and investigated several options to address the special needs of KPL and, forwarded this information on to Lisa Brown.
> > (i)Patricia Russo:
> > > -visited daycare centers;
> > > - a support group of Parents of Children with Down Syndrome;
> > > -Valley Community Services "LIFT" Program
> > > > - the local school district's program specifically designed to meet the needs of children with Down Syndrome.

79.  Lisa Brown comments on a visit of Karl and Mary Kay with KPL.

> *"Mr Lentz prefers to have the lights remain off during the supervised visits."*
> > EXHIBIT 15, page 2.
>
> (a) The supervised visit took place at the Department of Human Resources in the Administrative Building in the City of Birmingham.
>
> > (i) Instead of permitting the visit to take place in an upstairs "Family Room" replete with carpeting and appropriate seating, the visits took place in a concrete BUNKER intended for interrogations, not for visits with infants;
> >
> > (ii) Visits were NOT permitted in a natural setting or allowed outside of the Administrative Building;
> > ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(d)

(iii)the BUNKER was approximately an 8x8 stark white room, with glaring fluorescent lights with a long table and wooden chairs. There was no room to walk around, no room to sit on the floor and engage in any form of play.

(1) Karl and Mary Kay complained vehemently to Lisa Brown, Tenesha Felton , Tracy Currie, Anita Turner, and Beth Schaeffer.

(2) Their concerns were immediately dismissed and were told to "*Talk to your lawyer.*" and never informed they could request  help from an outside advocacy program.
RC CONSENT DECREE #59

(iii)Lisa Brown intentionally conducted the supervised visits in an alien environment to ensure that KPL would be as uncomfortable as humanly possible.
ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(d)

(1) Lisa Brown attempts to allude that by keeping the lights off during the supervised visits is somehow inappropriate, bizarre and menacing.

(2) The fluorescent light in the BUNKER was going bad.

A)Karl Lentz realized that if it exploded during the visit, KPL would be covered in oil;

B)The humming from the fluorescent light was so incessant and loud, it interfered with any and all communication;

C) Taking KPL's condition and comfort level into consideration, Karl Lentz requested that the lights would be turned off.

80.    In the Court Order, signed by Judge Sparks on 12 March 2002, Karl Lentz :
-did not have counsel;
-not afforded the right to a court-appointed attorney;
-was not informed of the alleged charges against him;
-was not made aware that this was a "Dependency Hearing" and its implications;

-could not address the Court;
 - because it was not a "trial" the Court would not accept testimony and/or evidence
-could not procure a record or transcript of said hearing.;
-visitation was suspended until further notice without reason
  RC CONSENT #59; ALABAMA ADMINISTRATIVE CODE
  BOOK 660-5-50-.04(1)(2);  660-5-50-.06(1)(e)

81. Any use of information purveyed during an ISP is without merit and borderline frivolous.  Even the acknowledgment that an "OFFICIAL" ISP took place under any guidelines and under certain procedural policies is a farce. The policy and practice ascribed by the ALABAMA ADMINISTRATIVE CODE BOOK, to the best of our knowledge, was never followed.

  (a) Lisa Brown still reports that Karl Lentz has a history of domestic violence which was proved unfounded;

  (b) Lisa Brown REFUSES to include any of our statements or concerns within these reports. ALABAMA ADMINISTRATIVE CODE BOOK 660-5-47-.05(5)(b)

82. During late summer of 2002, Karl and Mary Kay Lentz relocated to the family farm in Stuarts Draft, Virginia. Exhibit 19 - pic of Mary Kay pregnant

83. KSL , sibling to KPL. was born in Augusta County on 28 September 2002.

84. KSL, was a healthy 8lbs.3oz.

85. KSL was under the care of a local pediatrician, Dr Castello, Augusta Pediatrics, Fishersville, VA.
  (a) KSL received the appropriate immunizations in a timely manner.

86. KSL, while living in Virginia:
  (a) lived with her natural parents;
  (b) was breast-fed;
  (c)received timely and appropriate medical care;
  (d) excellent supervision;
  (e) beautiful, new clothing;
  (f) love and adoration of her paternal grandparents, paternal aunts, uncles and cousins.

87.    That Mary Kay, the Natural Mother, applied for, and was approved for, Food Stamps and Medicaid by the Social Services in Augusta County, Virginia.

88.    That the Natural Father, approximately six (6) weeks after Kolette's birth, returned to work,   as an independent contractor, and traveled to Florida.

89.    That the Natural Mother, two (2) weeks later, decided to join him in Florida and, on the way, to visit her family in Alabama to show off her new baby daughter.

90.    Lisa Brown, a case worker for the Jefferson County DHR, issued a pick-up order based on the charges of "NEGLECT"for KSL upon learning of the visit to Alabama.

91.    The pick-up order, dated 20 November 2002, was filed under the false pretense of neglect. Kolette Shay Lentz was happy, healthy and thriving while in the care of her Natural Parents and at the time of pick-up by Lisa Brown and Officers from the local Police Department.
            (a) At the time of pick-up, nor any time previous was there any of
            evidence of "NEGLECT" as defined by the
            ALABAMA ADMINISTRATIVE CODE BOOK
            660-5-34-.02 :
                    (1)    internal injuries (3)(a)(2);
                    (2)    burns and/or scalding (a)(3);
                    (3)    bone fracture(s) (a)(4);
                    (4)    cuts and/or bruises (a)(5);
                    (5)    evidence of human bites (a)(6);
                    (6)    sprains and/or dislocations(a)(7);
                    (7)    tying, close confinement (a)(8);
                    (8)    Fetal Alcohol Syndrome (a)(9);
                    (9)    Factitious disorder by proxy (a)(10).
            660-5-34-.02(3)
                    (1) abandonment;
            660-5-34-.02(8)
                    (1) failure to thrive;
            660-5-34-.02(9)
                    (1) Mary Kay Lentz did NOT test positive for alcohol and/or
                    drugs at the time of birth.

92.    Lisa Brown knowingly and maliciously claimed that she was unaware of the whereabouts of the Natural Father, or of any paternal relative(s) that would be willing to accept temporary placement for Kolette.

93. That false documentation was submitted by Lisa Brown on 20 November 2002 - failing in a mandated "reasonable effort" to avoid removal from the family.

94. That Lisa Brown has been relieved of her duties as a JCDHR agent as a direct result of this and other fraudulent court reports against the Natural Father.

95. The Natural Father objected to the DHR, and eventually the Family Court in Jefferson County, Alabama, to hear a custody case on the grounds that he, nor Kolette Shay, has ever been a domiciliary of Alabama.

# STANDARD OF REVIEW

This court reviews jurisdictional issues and other questions of law de novo.

See, e.g., R.C. v ANDY HORNSBY, Commissioner of the Alabama Department of

Human Resources, in 1991(United States District Court for the Middle District of

Alabama), a.k.a. RC v FULLER..

## SUMMARY OF THE ARGUMENT

I. General Challenge: The complaint contains a general challenge to the operations and

procedures of the Jefferson County Department of Human Resources and its

manipulation and influence over the Family Court System in Jefferson County and

its ability to deny citizens their right to due process accorded to him/her provided

under the                        ALABAMA CODE OF 1975,

section 26-14-7.1(1),(4),(6),(7)(a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k), (8).

II. Failure to Alter or Amend Order: When the Jefferson Family Court became aware

that our due process and civil rights had been violated, the Court had several

opportunities to amend court orders which would have set the "wheels of justice" in

motion to reunite the children with their NATURAL PARENTS. This is based on

RULE 60(b)(3)(6) which permits the introduction of "new" evidence to be brought to the

attention of the Court to attempt to set the record "straight".

## IMPACT STATEMENT

I humbly beseech for a moment of this Honorable Court's time to be allowed to digress to articulate the atrocities that this Family has endured by the operational procedures of the Department of Human Resources and the Family Court systems in Jefferson County.

We have exhausted every administrative and judicial avenue in the attempt to rectify and reunite this Family within our legal rights of due process under the law. Any attempt to essay information of the "alleged" charges, the right to obtain counsel, in any way, shape, form or mean to become active in this process  was immediately thwarted by the threat of imprisonment.  That "HEARINGS" , "TRIALS" and "REVIEWS" were held without our knowledge, in clandestine meetings that irrevocably altered the course of our lives throughout the past five years.

That this civil lawsuit is a FIGHT for the PRESERVATION of MY FAMILY, not a lawsuit of mergers and acquisitions of mere baubles, nor the mere dalliances of an Agency's whim, but we are "FLESH AND BLOOD".  We all are but the most sacred of God's creatures, and His Gift - our ability to have offspring, who are the culmination of all our HOPES, our DREAMS, our AMBITIONS.....our CHILDREN.

The Movant was denied through the use of malicious fraud, the custody of his/ this family's  children: KPL,  KSL and KNL by the STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES , that by the willful Manipulation of this

administrative agency's "social workers" and by their total control within their sphere of influence over the Tenth Circuit Court of Alabama in Jefferson County, Family Court Judiciary Agents and legal counsellors have kidnaped my children.

Through the Racketeering activities of this Agency, through their reign of misery, sorrow and sheer terror not only upon the citizens ensnared in this "web of deceit", but also upon the their Defending Attorney's, who, too, are threatened by the Jefferson County Court REFEREES/JUDGES absolute and maniacal rule - enamored by their own sense of self-worth in an arena where a captive audience to proselytize their own theories and beliefs - are to reign supreme, disregarding the People's right of self-determination and be allowed the luxury of "family". The wanton abandon to inflict their will, without evidence, without due process on the lower economic classes of society is deplorable and reprehensible.

"IF" after years of transgressions and intimidation, the Department of Human Resources and the REFEREES/JUDGES are thwarted and do not "break" the indomitable spirit - to still have the *stamina* to not scream out "*Yes, I am guilty! Of what, I do not know, but please stop!*" To watch, to endure as the DHR taunts you - dangles your children before your eyes like a carrot on the end of a stick, to jump through their hoops without the benefit of an explanation or evidence is abhorrent. To completely understand that you have done nothing wrong, that "someone" has the POWER to take away your CHILDREN "just because" and that you are powerless; that you have NO recourse is debilitating. This Family has *suffered.* Jobs were lost, careers put on hold, holidays were meaningless - *TIME HAS BEEN IRRETRIEVABLY LOST CREATING MEMORIES*

*WITH OUR CHILDREN.*

That an "Agency" under Color of Law can deny you of Holidays, Birthdays, Vacations, Religious milestones "just because" or a supposition that, even though evidence doesn't exist now, but perhaps "maybe" "someday" "something *might* go wrong" in the Future is ludicrous, repugnant and un-American.

We, the common man, are not the only individuals that are adversely affected nor have a total disdain for the phrase "*Department of Human Resources*" a.k.a "*DHR*" in Alabama, and those individuals would be the hapless "alleged" DEFENSE ATTORNEY. Any attorney that has the misfortune of having his/her die cast into a social services "case", that after a methodical procession of agonizing depravity by DHR's manipulation of hearts, spirits, minds and souls - that through their incessant proselytizing of abusive operational policies including, but not limited to: intimidation, terrorism, fear, humiliation, coercion, punishment, threat of reprisals - reprisals as repulsive as: alienation of affection through enforced separation, name changes, the denial of participating in daily milestones, denial of access to his/her family - essentially, stripping any bond and connection of the parent/child/family relationship, the Defense Attorney has no choice but to turn the other way or be victimized himself/herself.

The plight of the Defense Attorney to recognize that injustices are occurring and feeling powerless to put a stop to it, must feel emasculated. It is with empathy that we view our Defense Attorney. He realized that the "system of care" in Jefferson County was encroaching on and annihilating our civil rights and, lamented that there was nothing he could do. The Machiavellian attitude to rationalize that occasionally, an innocent family

will be decimated and the "collateral damage" is to be expect in all of life's endeavors - to justify the calamitous effects this 'experience' has had on this family is somewhat regrettable and a necessary evil is U N AC C E P T  A B L E.

The Department of Human Resources and the Family Court system in Jefferson County and its Agents are unequivocally the source of this Family's nightmares, however, we are not seeking retaliation nor reprisals on a personal level. To repay these transgressions against this Family would only cause further harm. To place all the blame of the total and wanton destruction of this Family's civil rights and the irreparable harm by the hands of the Agents representing the State of Alabama to this Family, squarely on the shoulders of Jefferson County, would be unfair. For we, this Family, understand that this "child welfare system" is a billion dollar industry, not a non-profit faith-based organization. THIS IS A BUSINESS. It is easy federal money. DHR preys upon the lower economic classes with no access to legal resources and has no fear of reprisal or accountability because the presumption is "you must be guilty"and "Who will believe you?"

It is our hope that the ALABAMA DEPARTMENT OF HUMAN RESOURCES remains on FEDERAL PROBATION, to enforce upon them accountability for their actions and that wantonly separating families to increase the STATE coffers WILL NOT be tolerated.

We move for mercy to those who intentionally pained us through this ordeal. Through our faith in GOD, we hope they shall be moved to use better judgment and compassion and to let their conscience guide them through their world, just as God has blessed this Family.

IN Conclusion,  I fully understand that this is a "CIVIL COURT" not a "Common Law" Court and I /we , my Family will try to do our best from now on to not bestow inferences to the Almighty Creator. But still "May God speed us through and show each other kindness, justice, respect and mercy for all, may God guide us and bless us all, through these lawsuit proceedings ."

# REMEDY and RELIEF

## DIRECTION OF THE LAWSUIT - OPTIONS

### OPTION #1

The IMMEDIATE return of our children.

We will sue the top four named individuals: GOVERNOR BOB RILEY, PAGE WALLEY, acting DIRECTOR of the DHR; the HON. CHIEF JUSTICE NABERS, Presiding Head of the ALABAMA SUPREME COURT and the HON. TROY KING, as Head of the STATE of ALABAMA OFFICE of the ATTORNEY GENERAL  for failure to properly train their STAFF, which permitted the eradication of our civil rights; which led to the kidnaping of our children Under the Color of Law.

### OPTION #2

The IMMEDIATE return of our children.

We will sue the employees/ agents/ representatives of the DEPARTMENT OF HUMAN RESOURCES of ALABAMA and the FAMILY COURT system in JEFFERSON COUNTY and others herein named for conspiring to kidnap, collusion to deny due process and civil rights; and, racketeering for manipulating and falsifying court reports and records to receive  Federal Funding under false pretenses.

### OPTION #3

We will enter into MEDIATION, in which we will respectfully request the following:

(1)     The IMMEDIATE return of our children, KPL, KSL and KNL;

(2)     The ability to leave the STATE of ALABAMA unhindered and without incident;

(3)     ONE BILLION DOLLARS in damages;

(4)     That the "case files" are expunged from the record;

(5)     That the ALABAMA DHR remains under FEDERAL PROBATION indefinitely with no more requests from the GOVERNORS office for leniency because the DHR is violating the civil rights of others ;

(6)     That the STATE OF ALABAMA reimburse the FEDERAL GOVERNMENT for funds it illicitly received for kidnaping my children;

(7)     That, within the next three years, that the ALABAMA DHR is prohibited
        from acting as an intermediary solution between children and their families
        in regards of their placement and that the federal funding be directed to
        faith-based, for non-profit organizations promoting family unity.

## REMEDY, cont'd:

If these children were the daughters of President George Bush, I am sure he would bring to bear
force against the "terrorists"dividing his family, one would assume he would find a way to use
weapons of mass destruction to bring justice and reunification to his Family.

If these children were Martha Stewart's children, I am sure someone would go to a minimum
security FEDERAL PRISON.

If these children belonged to Donald Trump, someone would certainly hear
*"YOU'RE FIRED!"* by someone in authority.


The ANGUISH of the deprivation of civil rights this Family has suffered is beyond

description. For us to only pray to this COURT for justice to this Family, to pray for their safe

return is in keeping with our Christian beliefs- we are not asking for revenge, for jail sentences or

for people to lose their jobs. We have had our children RIPPED from our lives and we have been

STRIPPED of our CIVIL RIGHTS as AMERICANS. This Family has SUFFERED because of

the unchecked POWER of the ALABAMA "SYSTEM OF CARE", and the enticement of

unlimited Federal Funding motivates the "system of care" to go on a state-sanctioned witch-hunt,

to find "problems" where none exist, where there is no motivation for the DHR and its Agents,

to show mercy and use common sense, and in acting Under the Color of Law, in conjunction

with the corrupt Family Court system in Jefferson County - where collusion and flagrant abuse of

the LAW is a daily occurrence and condones these "legal" kidnappings.

## CERTIFICATE OF SERVICE

I, Karl R. Lentz, do hereby certify that prior to, or immediately after the filing the foregoing with the Court, I mailed by U.S. Express Mail, postage pre-paid, or delivered by hand a copy to (SEE ATTACHED) :

DATE: October 17th 2006     SIGNATURE: _____

## CERTIFICATE OF COMPLIANCE

I, the undersigned hereby certifies that the foregoing has been prepared in accordance with the font type and margin requirements of Local Rule _____ of the Middle District of ALABAMA, using the font type Times New Roman and a point size of 14.

OCTOBER 17th 2006     KARL Rudolph LENTZ
                      710 Augusta FARMS Rd
                      WAYNESBORO, VA 22980
                      678-665-0593